2020 IL App (1st) 181991-U

SIXTH DIVISION
AUGUST 14, 2020

No. 1-18-1991

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* M.M., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| v. | ) | No. 16 JD 01905 |
| | ) | |
| M.M., | ) | Honorable |
| | ) | Darryl Jones, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not consider the respondent's failure to testify when it adjudicated him delinquent; the evidence was sufficient to find the respondent guilty of each offense.

¶ 2    Following a bench trial in the circuit court of Cook County, the respondent-appellant, M.M., was adjudicated delinquent for aggravated possession of a stolen motor vehicle, aggravated assault upon a peace officer, and aggravated fleeing and eluding a peace officer. The respondent now appeals, arguing that the trial court improperly considered his failure to testify and that the

evidence was insufficient to find him guilty of each offense. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                      BACKGROUND

¶ 4     The respondent was charged with aggravated possession of a stolen motor vehicle, aggravated assault upon a peace officer, and aggravated fleeing and eluding a peace officer for an incident that occurred on August 20, 2016. The respondent was 15 years old at the time. A bench trial commenced and the following evidence was presented.

¶ 5     Allen Butler testified that, on August 20, 2016, he owned a dark blue 2016 BMW X4 sport utility vehicle (the BMW). At approximately 2:15 p.m., the BMW was parked on the 900 Block of North Honore Street in Chicago and Mr. Butler was taking an item out of the back of it. Suddenly, he looked up and saw an individual pointing a gun at his face. A second individual appeared and demanded that Mr. Butler hand over his car keys, cell phone, and wallet.[1] Mr. Butler handed over the items and the individuals instructed him to walk away, which he did. As he walked, he heard the BMW drive away.

¶ 6     The State asked Mr. Butler if the license plate to the BMW was Q320804. Mr. Butler responded: "That sounds about right. Again, it's been 18 months since I've seen the tag and also keep in mind, I've only owned the car -- the car was *** only two months old when it was stolen." Mr. Butler further testified that later in the evening on August 20, 2016, he saw the BMW on the news when it was part of a high-speed chase. Mr. Butler was unable to identify the respondent in court as one of the two individuals who had held him up at gunpoint.

¶ 7     Illinois State Police Lieutenant Juan Valenzuela testified that on August 20, 2016, at

---

[1]During his testimony, Mr. Butler did not describe the individuals except to indicate that they were both male.

approximately 6:45 p.m., he was in uniform driving southbound on the Dan Ryan expressway toward 35th Street. He was driving an unmarked police car, which was equipped with emergency lights and sirens. He suddenly saw a dark BMW SUV approach from behind, driving at a high rate of speed and maneuvering between traffic lanes. The BMW accelerated past Lieutenant Valenzuela. He began following the BMW so that he could see the license plate, although he did not yet turn on his emergency lights or sirens. He estimated that he and the BMW were traveling at 100 miles per hour. He eventually got close enough and was able to "run the license plate" on the BMW. The State asked Lieutenant Valenzuela: "Was the license plate Q-320804?," to which he responded, "It does sound right, yes." After running the license plate, the radio operator notified Lieutenant Valenzuela that the BMW had been "taken in an aggravated vehicular hijacking."

¶ 8    Lieutenant Valenzuela then requested assistance over the radio. He continued to follow the BMW as it sped and made erratic lane changes. Eventually, the BMW exited the expressway at 63rd Street and Lieutenant Valenzuela activated his emergency lights and sirens. The BMW went through a red light and got back onto the expressway going northbound. Lieutenant Valenzuela followed the BMW back onto the expressway and continued to give information over the radio as he waited for assistance. He testified that the BMW was driving more than 100 miles per hour and made "severe maneuvers between the shoulder and erratic lane changes." The BMW encountered traffic near 47th Street and momentarily slowed down. When the BMW slowed down, Lieutenant Valenzuela was able to see four people inside it.

¶ 9    Illinois State Trooper Anthony Muzzillo heard Lieutenant Valenzuela's radio transmissions and stationed his unmarked police car near 35th Street. As the BMW passed 35th Street, Trooper Muzzillo joined the pursuit. The BMW continued driving along the Dan Ryan expressway at high speeds but eventually exited at Cermak Road. As the BMW exited the

expressway and approached Cermak Road, traffic forced it to come to a complete stop. It then veered onto the shoulder and maneuvered back through traffic lanes until it stopped completely in the middle of the road.

¶ 10    Lieutenant Valenzuela stopped behind the BMW and exited his car. He drew his weapon and approached the driver's side of the BMW. He stood slightly behind the driver's door and saw the respondent, whom he identified in court, sitting in the driver's seat. Trooper Muzzillo also arrived at the scene and positioned himself on the passenger's side of the BMW, near the hood. Lieutenant Valenzuela ordered the respondent to unlock the doors and lower the window. He saw the respondent reaching for the gears and yelled for him to stop. Lieutenant Valenzuela also tried to open the driver's window with his free hand and elbow.

¶ 11    Lieutenant Valenzuela testified that at that time, he was very close to the respondent and there was nothing obstructing his view. Lieutenant Valenzuela's testimony was:

> "The sun was at my backside. It was a Saturday evening. I do believe that the window had tinted glass, but I'm still able to see inside the vehicle. I believe the seat was a little bit back, so I was able to see the driver from the back passenger window and I don't think not so much from the actual driver's side window, because he might have been feathering back and then looking at whatever he was attempting to try and do."

The respondent then put the BMW in reverse and began backing up. Lieutenant Valenzuela ordered him to stop, but the respondent turned the wheels in the direction of Trooper Muzzillo and began accelerating forward. Lieutenant Valenzuela was "in fear of Trooper Muzzillo's life" and thought the respondent was going to run over him. Lieutenant Valenzuela began firing his weapon

at the respondent.

¶ 12    The respondent accelerated the BMW forward and Trooper Muzzillo quickly jumped out of the way. The respondent drove the BMW toward Cermak Road and both Lieutenant Valenzuela and Trooper Muzzillo got back into their vehicles and continued the pursuit. Illinois State Trooper Theresa Allen also joined the pursuit at that time. All three officers followed the respondent with their emergency lights and sirens activated. Trooper Allen led the pursuit as the respondent drove the BMW toward downtown. The respondent sped, jumped curbs and sidewalks, and drove the wrong way into oncoming traffic. Eventually, the respondent stopped the BMW at the corner of Roosevelt Road and Wabash Avenue. The respondent and his three passengers fled the BMW on foot. Lieutenant Valenzuela was able to arrest one of the passengers. He subsequently took a closer look at the BMW and saw bullet holes in the driver's door and bloodstains on the driver's seat and door.

¶ 13    Two days later, Lieutenant Valenzuela reviewed a photo array and identified the respondent as the driver of the BMW. The State then introduced and published a video from Lieutenant Valenzuela's dashcam, which corroborated Lieutenant Valenzuela's description of the incident.

¶ 14    Trooper Muzzillo testified that, on the evening of August 20, 2016, he was in full uniform and driving an unmarked police car equipped with emergency lights and sirens. At approximately 6:45 p.m., he monitored a radio call from Lieutenant Valenzuela and drove northbound on the Dan Ryan expressway to the exit ramp at 35th Street. He saw the BMW drive by, followed by Lieutenant Valenzuela's squad car. He activated his emergency lights and sirens and joined the pursuit.

¶ 15    When the BMW exited the expressway at Cermak Road and stopped, Trooper Muzzillo got out of his vehicle and approached the passenger side of the BMW with his weapon drawn. Trooper Muzzillo could not see into the BMW because of the way the sun was shining, so he moved toward the front of it, near the hood. He looked into the BMW and saw four people inside.

¶ 16    Trooper Muzzillo testified that the driver of the BMW suddenly put the car in reverse and turned the steering wheel toward him. Trooper Muzzillo repeatedly shouted: "stop or I will shoot you." The driver ignored these commands and began driving toward Trooper Muzzillo. Trooper Muzzillo testified: "I actually thought I was going to get run over, so I actually pushed myself off the hood of the vehicle and fired one shot in the vehicle." He then ran back to his squad car and continued pursuing the BMW as it sped off. Trooper Muzzillo eventually arrived at Roosevelt Road and Wabash Avenue where he saw the BMW parked partially on the sidewalk. There was blood on the driver's seat. The State then introduced and published a video from Trooper Muzzillo's dashcam, which corroborated Trooper Muzzillo's description of the incident.

¶ 17    The State also introduced and published the dashcam video from Trooper Allen's squad car. The video showed her joining the pursuit of the BMW just after the shooting near Cermak Road. Trooper Allen led the final part of the chase. The video from her squad car showed the BMW first cross two lanes of traffic, cut off a car, and turn onto another street. The BMW then weaved through traffic, ran through multiple red lights, drove into oncoming traffic, and nearly collided with several other cars. Trooper Allen's emergency lights reflected off the BMW. The BMW eventually pulled up onto a curb at the corner of Roosevelt Road and Wabash Avenue and came to a complete stop. All four people inside the BMW opened the doors and fled on foot. The driver of the BMW was wearing a white t-shirt. Trooper Allen stopped her squad car behind the BMW and exited it. The video showed her in full uniform chasing the individuals on foot.

¶ 18    Cindy Richard testified that on August 20, 2016, at approximately 6:45 or 7:00 p.m., she was in her car near State Street and 11th Street, waiting to pick up her fiancé from work. She suddenly saw a young man run out of an alley and past her car. He was wearing a white t-shirt and bleeding down the left side of his body. He was holding his arm like it was limp. She drove over to him to see if he needed help. The young man approached her car and asked her to help him, and she agreed. The young man got into her car and she drove him to Stroger Hospital. The young man was bleeding from a bullet hole in his neck and he was afraid he was going to die. She let him use her cell phone to call his mother during the drive. She then dropped him off at Stroger Hospital and drove away. Ms. Richard testified that she could not recall what the young man looked like.

¶ 19    Illinois State Police Sergeant Julia Grabowski testified that on August 20, 2016, at approximately 8:00 p.m., she arrived at Stroger Hospital. She observed the respondent, whom she identified in court, in the emergency room with a bandage on his neck. Medical staff informed her that the respondent had suffered a bullet graze wound to his neck.

¶ 20    The State introduced and published a cell phone video filmed by an individual who was sitting in traffic off Cermak Road at the same time that the BMW was briefly stopped there. The cell phone video showed Lieutenant Valenzuela's squad car from behind, as well as the back of the BMW. The video depicted Lieutenant Valenzuela standing beside the BMW driver's side door with his weapon drawn and pointed at the driver. He also attempted to open the driver's side door and window. Trooper Muzzillo approached the BMW from the other side with his weapon drawn and stood near the hood on the passenger's side of the vehicle. The video further showed the BMW back up, turn its wheels in the direction of Trooper Muzzillo, and then accelerate forward. Trooper Muzzillo quickly took several steps out of the way. The BMW sped off and the officers fired their

weapons at it. The cell phone video showed emergency lights on Lieutenant Valenzuela's squad car and the sound of multiple sirens.

¶ 21   The State then rested. The respondent moved for a directed verdict, which was denied. The respondent did not testify or present any evidence.

¶ 22   During closing arguments, the respondent argued that there was insufficient evidence to prove he knew the BMW was stolen. He claimed it was instead merely a case of "bad driving" and asked the trial court to not make the inference that he knew the BMW was stolen based solely on his erratic driving. The respondent further claimed that the State failed to prove he was fleeing from the officers because they drove unmarked cars with no emergency lights or sirens. He also argued that Trooper Muzzillo was not in reasonable apprehension of getting struck or run over because he stood on the side of the BMW and "had no problem getting out of the way." The respondent additionally argued that the State failed to prove he was the driver of the BMW, especially since neither Mr. Butler nor Ms. Richard identified him in court.

¶ 23   Following closing arguments, the trial court noted that "there's not multiple identifications" of the respondent but pointed out that Lieutenant Valenzuela positively identified the respondent as the driver of the BMW. The trial court stated that "all it takes is one" identification and that it found Lieutenant Valenzuela to be "very credible."

¶ 24   The trial court rejected the respondent's argument that the State failed to prove he knew the BMW was stolen. The trial court stated:

> "The [respondent] argues that there could be other explanations as to why, but you can't just infer it based on the circumstances. Maybe he didn't want to get arrested just for driving badly. But there is case law indicating that the court can take into

consideration the surrounding facts. Direct proof is not needed.
Direct proof, that the knowledge is not needed, but the Court can
infer it based on all of the surrounding facts.

\*\*\*

And, of course, the [respondent] could testify as to if there's
a reasonable explanation. Of course, the burden is on the State, but
the [respondent] can -- if there's some other reasonable explanation
as to why he had the [BMW], he's allowed to put on a case there.
The [respondent] does not have to testify and he didn't testify."

¶ 25 The court continued by noting that the video evidence showed just how erratic and dangerous the respondent drove, stating, "the testimony I don't believe gives enough color to what actually occurred." The court found that the respondent knew the BMW was stolen and that he was purposefully fleeing from the police.

¶ 26 Regarding the aggravated assault charge, the trial court stated that the video evidence showed the BMW accelerating toward Trooper Muzzillo and that "it was reasonable for the trooper to believe that he was about to get hit at that point."

¶ 27 The trial court concluded by finding that the State had met its burden on all charges and it adjudicated the respondent delinquent for aggravated possession of a stolen motor vehicle, aggravated assault upon a peace officer, and aggravated fleeing and eluding a peace officer. The respondent filed a motion for a new trial, which the trial court denied. The trial court subsequently sentenced the respondent to one year of probation with 30 hours of community service. This appeal followed.

¶ 28                              ANALYSIS

¶ 29    We note that we have jurisdiction to review the trial court's judgment, as the respondent filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 30    The respondent raises the following issues on appeal: (1) whether the trial court improperly considered that the respondent did not testify and did not present any evidence; (2) whether the State proved that the respondent was the driver of the BMW; (3) whether the State proved the respondent guilty of aggravated possession of a stolen vehicle; (4) whether the State proved the respondent guilty of aggravated assault upon a peace officer; and (5) whether the State proved the respondent guilty of aggravated fleeing and eluding a peace officer. We take each issue in turn.

¶ 31    The respondent first argues that in finding him guilty, the trial court improperly considered that he did not testify and did not present any evidence. He points out that, during the ruling, the trial court explicitly noted that he did not testify or present any evidence. The respondent argues that this violated his fifth amendment right to not testify and improperly shifted the burden of proof to him. He concedes that the trial court "[caught] itself" and acknowledged that the respondent did not have to testify and that the burden was on the State, but the respondent claims that this "did not negate its earlier comments."

¶ 32    An accused has the constitutional right to not testify in his trial. U.S. Const., Amend. V; *People v. Edgecombe*, 317 Ill. App. 3d 615, 620 (2000). No negative inference from a defendant's failure to testify is permitted. *Mitchell v. United States*, 526 U.S. 314, 327-28 (1999). The standard of review for determining whether a defendant's constitutional rights have been violated is *de novo. In re A.W.*, 231 Ill. 2d 92, 106 (2008).

¶ 33    The respondent takes issue with the following comment by the trial court:

          "And, of course, the [respondent] could testify as to if there's

> a reasonable explanation. Of course, the burden is on the State, but the [respondent] can -- if there's some other reasonable explanation as to why he had the [BMW], he's allowed to put on a case there. The [respondent] does not have to testify and he didn't testify."

A trial court generally should not comment on a defendant invoking his right to remain silent. *People v. Crabtree*, 162 Ill. App. 3d 632, 635 (1987). However, the trial court in this case *explicitly stated* that the respondent did not have to testify and that the burden of proof was on the State. Reading the comment at issue in its entire context, it is clear that the trial court was commenting on the evidence presented during trial and rejecting the respondent's theory, which it was free to do. See *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 28 (the trial court is free to comment on the implausibility of the defendant's theories).

¶ 34    The respondent additionally argues that the trial court misapplied the permissive inference rule, which allows the trier of fact, under certain conditions, to infer that a person exercising exclusive unexplained possession over a stolen vehicle has knowledge that the vehicle is stolen. *People v. Dinelli*, 217 Ill. 2d 387, 389 (2005). The respondent claims that the trial court did not apply the permissive inference rule properly in this case regarding his unexplained possession of the BMW. Specifically, the respondent claims that the trial court improperly inferred that he knew the BMW was stolen based on the fact that the respondent did not testify or present any evidence to explain his possession over the BMW. We are not persuaded by this argument. As discussed *infra*, the trial court determined that the respondent knew the BMW was stolen based on all the circumstantial evidence in this case, for example, the respondent fled from the police in a clear effort to evade capture. There is nothing in the record to support a finding that the trial court inferred that the respondent knew the BMW was stolen based on the respondent's failure to testify

or present any evidence. Accordingly, the trial court did not improperly consider the respondent's failure to testify nor did it shift the burden of proof to the respondent in its finding of guilt. The respondent's fifth amendment rights were therefore not violated.

¶ 35    The respondent's remaining arguments all challenge the sufficiency of the evidence and allege that the State failed to prove him guilty of each offense. The State has the burden of proving each element of an offense, beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. When a defendant challenges the sufficiency of the evidence, the proper standard of review is; whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt as to the defendant's guilt. *Id*.

¶ 36    The respondent first argues that the State failed to prove he was the driver of the BMW. He claims that the sole identification came from Lieutenant Valenzuela, who viewed the driver of the BMW under "poor conditions," *i.e.,* there were lots of distractions, the windows to the BMW were tinted, and the sun was bright. He claims that because there are no other identifications and no physical or forensic evidence linking him to the BMW, the only evidence that he was the driver of the BMW is Lieutenant Valenzuela's identification, which is insufficient.

¶ 37    While the respondent is correct in that there was only one eyewitness identification in this case, identification from a single eyewitness is sufficient to sustain a conviction if the witness viewed the offender under circumstances permitting a positive identification. *People v. Vega*, 2018 IL App (1st) 160619, ¶ 45. And a positive identification "does not have to stem from a long observation under perfect conditions." *People v. Young*, 269 Ill. App. 3d 120, 123 (1994). Here, Lieutenant Valenzuela testified that the conditions allowed him to adequately view the respondent

in the driver's seat of the BMW. Particularly, he was close enough to the driver's window that he was able to touch it and focus directly on the driver. The respondent makes much of the fact that the sun was shining brightly at the time. However, Lieutenant Valenzuela testified that the sun was behind him and did not hinder his view. Importantly, the trial court found Lieutenant Valenzuela to be credible. See *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23 (where the trial court finds a witness' identification and testimony to be credible, the lack of physical evidence is irrelevant).

¶ 38    Further, the circumstantial evidence supports Lieutenant Valenzuela's identification of the respondent as the driver of the BMW. See *People v. Johnson*, 2018 IL App (1st) 150209, ¶ 19 (circumstantial evidence is sufficient to sustain a criminal conviction). The video evidence and testimony at trial established that the driver of the BMW was wearing a white t-shirt and had been injured by a bullet during the chase. Cindy Richard testified that she saw a young man wearing a white t-shirt while running in the vicinity of the abandoned BMW. He had a neck wound for which she took him to Stroger hospital. The respondent was treated at that same hospital within the same time frame for a neck wound caused by a bullet. Considering all of this evidence, taken together, we find that the State proved the respondent to be the driver of the BMW.

¶ 39    Next, the respondent argues that the State failed to prove him guilty of aggravated possession of a stolen motor vehicle where there was insufficient evidence that he knew the BMW was stolen. He highlights that there was no damage to the BMW, which is "one of the most significant factors" in determining knowledge that a vehicle is stolen. He claims that the trial court inferred that the respondent knew the BMW was stolen based solely on the way he was driving it, which was insufficient. He claims that his erratic driving was nothing more than a "panicked 15-year-old driving illegally." The respondent also argues that the State failed to prove him guilty of aggravated possession of a stolen motor vehicle where there was insufficient evidence to prove the

BMW that was recovered was the same BMW that was stolen.

¶ 40 To prove a defendant guilty of aggravated possession of a stolen motor vehicle, the State must prove that the defendant was the driver or operator of a particular vehicle and he was not entitled to possession of that vehicle, and he knew it was stolen or converted. 625 ILCS 5/4103.2(a)(7)(A) (West 2016).[2] "Knowledge that a vehicle or essential part is stolen or converted may be inferred: (A) from the surrounding facts and circumstances, which would lead a reasonable person to believe that the vehicle or essential part is stolen or converted; or (B) if the person exercises exclusive unexplained possession over the stolen or converted vehicle or essential part, regardless of whether the date on which the vehicle or essential part was stolen is recent or remote." 625 ILCS 5/4-103(a)(1) (West 2016).

¶ 41 The respondent makes much of the fact that there was no damage to the BMW and that the key was in the ignition. While visible damage to a vehicle, such as a peeled steering column, loose wires, or broken locks, can be a strong indicator of knowledge that the vehicle was stolen, the absence of such damage does not necessarily mean a lack of knowledge. *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 59. This is especially true under the facts of the instant case, where the car keys were stolen at gun point along with the BMW.

¶ 42 Moreover, direct proof of knowledge that the vehicle is stolen is not necessary. *Id.*, ¶ 59. Instead, knowledge may be proven by circumstantial evidence. *Id.* And the circumstantial evidence in this case, when taken together, easily establishes that the respondent knew that the BMW was stolen. He drove erratically and led the police on a high-speed chase for a long distance; refused to pull over when ordered to do so; drove into oncoming traffic; and subsequently abandoned the

---

[2]The State must also prove that the defendant was given a signal by a peace officer directing him to bring the vehicle to a stop and he willfully failed or refused to obey the direction, increased his speed, extinguished his lights, or otherwise fled or attempted to elude the officer. 625 ILCS 5/4103.2(a)(7)(A). The respondent does not challenge this element of the offense.

BMW and fled on foot, while bleeding from a neck wound he received during the high-speed chase. See *People v. Span*, 156 Ill. App. 3d 1046, 1050 (1987) ("a high speed chase followed by defendant's flight on foot are inconsistent with defendant's claims of innocence"). Contrary to the respondent's claim, the trial court did not infer that the respondent knew the BMW was stolen based *solely* on his speeding and erratic driving. Indeed, the respondent's flight from the BMW while wounded and bleeding from his neck as he continued to evade the police, is arguably the biggest indicator of his knowledge that the BMW was stolen and the trial court clearly considered that fact. See *People v. Smith*, 226 Ill. App. 3d 433, 436–37 (1992) ("flight from the stolen motor vehicle is evidence tending to show that defendant knew the vehicle was stolen"). We accordingly reject the respondent's argument that the State failed to prove he knew the BMW was stolen.

¶ 43     The respondent additionally argues that the State failed to prove that the BMW which was recovered was the same BMW which was stolen. He claims that Mr. Butler's testimony regarding the license plate number was "unreliable" and that Mr. Butler never identified the recovered BMW as his. He also argues that the State never introduced evidence of matching VIN numbers. However, the respondent does not cite to any authority which supports his theory and this court did not find any. Instead, a matching make, model, and license plate number is sufficient to identify a stolen motor vehicle. *People v. Posey*, 83 Ill. App. 3d 885, 890 (1980). And in this case, a dark blue 2016 BMW X4 bearing an Illinois license plate number Q320804 was stolen at gunpoint from Mr. Butler. A few hours later, the respondent was seen driving a dark blue 2016 BMW X4 bearing an Illinois license plate number Q320804, only a few miles away from where it was stolen. Mr. Butler also saw his BMW on the news that same night involved in a high-speed chase. Not to mention, it is not even necessary to prove specific ownership of a stolen vehicle; only that someone other than the respondent had a superior interest in the vehicle. *Smith*, 226 Ill. App. 3d at 438.

Thus, we affirm the respondent's conviction for aggravated possession of a stolen motor vehicle.

¶ 44    The respondent next argues that the State failed to prove him guilty of aggravated assault upon a peace officer. Specifically, he avers that there was insufficient evidence to prove that Trooper Muzzillo was in reasonable apprehension of being struck by the BMW. He claims that Trooper Muzzillo strategically stood to the side of the BMW so that he could move out of the way if needed, and so it necessarily follows that he could not have feared being hit or run over.

¶ 45    As charged in the instant case, to convict the respondent of aggravated assault upon a peace officer, the State was required to prove either: (1) that the respondent knowingly engaged in conduct that placed Trooper Muzzillo in reasonable apprehension of receiving a battery, knowing that he was a peace officer (720 ILCS 5/12-2(b)(4.1) (West 2016)); or (2) that the respondent, without justification, operated a motor vehicle in a manner that placed Trooper Muzzillo in reasonable apprehension of being struck by the vehicle (720 ILCS 5/12-2(c)(8) (West 2016)). Reasonable apprehension is an objective standard. *In re Gino W.*, 354 Ill. App. 3d 775, 779 (2005). "[R]easonable apprehension may be inferred from the evidence presented at trial, including the conduct of both the victim and the respondent." *Id.* at 778. Whether the victim was in reasonable apprehension is a question of fact that the trier of fact must resolve. *Id.* at 777–78.

¶ 46    Trooper Muzzillo testified that he thought he was "going to get run over" when the respondent turned the BMW in his direction and accelerated. His testimony was corroborated by Lieutenant Valenzuela's testimony that he also was "in fear of Trooper Muzzillo's life." Further, the video footage from Lieutenant Valenzuela's dashcam shows the respondent turning the BMW in the direction of Trooper Muzzillo and accelerating forward, while Trooper Muzzillo quickly jumps out of the way to avoid being hit or run over. The cell phone video, which was filmed from a different angle, also shows Trooper Muzzillo directly in the path of the BMW and having to leap

out of the way. Watching the video footage, it is clear that if Trooper Muzzillo had not moved out of the way as quickly as he did, the respondent would have struck him with the BMW. The officers' testimonies, coupled with the video footage, was sufficient evidence for the trial court to find that the respondent placed Trooper Muzzillo in reasonable apprehension of being struck by the BMW. We therefore affirm the respondent's conviction of aggravated assault upon a peace officer.

¶ 47    Finally, the respondent argues that the State failed to prove him guilty of aggravated fleeing and eluding a peace officer. He points out that the charging instrument named Trooper Allen for this offense, but the State did not call Trooper Allen as a witness. He claims that there was insufficient evidence to prove that Trooper Allen was in full uniform or that she had activated her emergency lights and sirens.

¶ 48    The operative offense is aggravated fleeing or attempting to elude a peace officer pursuant to 625 ILCS 5/11-204.1(a)(4) (West 2016):

> "The offense of aggravated fleeing or attempting to elude a peace officer is committed by any driver or operator of a motor vehicle who flees or attempts to elude a peace officer, after being given a visual or audible signal by a peace officer in the manner prescribed in subsection (a) of Section 11-204 of this Code, and such flight or attempt to elude *** involves disobedience of 2 or more official traffic control devices."

Section 11-204(a) provides:

> "The signal given by the peace officer may be by hand, voice, siren, red or blue light. Provided, the officer giving such signal shall be in police uniform, and, if driving a vehicle, such

vehicle shall display illuminated oscillating, rotating or flashing red

or blue lights which when used in conjunction with an audible horn

or siren would indicate the vehicle to be an official police vehicle."

625 ILCS 5/11-204(a) (West 2016).

¶ 49    Lieutenant Valenzuela specifically testified that Trooper Allen pursued the respondent with her emergency lights and sirens activated. Nonetheless, the respondent claims that Lieutenant Valenzuela's testimony, standing alone, is insufficient evidence. However, the respondent completely ignores the video evidence in this case. The video footage from Trooper Allen's dashcam shows her pursuing the respondent as he fled in the BMW and her emergency lights reflected off the BMW. It also shows the respondent disobeying traffic control devices by running through numerous red lights. Video footage from Trooper Muzzillo's dashcam also shows Trooper Allen pursuing the BMW with her emergency lights and sirens activated.

¶ 50    Additionally, the video evidence from Trooper Allen's dashcam shows that she was wearing a full police uniform when she exited her squad car to chase the respondent and his passengers on foot. The respondent invites us to speculate that the female officer seen exiting the squad car in full uniform and chasing the respondent is possibly not Trooper Allen, since she did not testify or identify herself. This is a specious argument. Contrary to the respondent's assertion, there is nothing to "interpret" or "craft" from the video footage. Trooper Allen's testimony about the pursuit was not necessary considering that the video evidence explicitly showed: the respondent fleeing from Trooper Allen's squad car; Trooper Allen in full uniform with her emergency lights and sirens activated; and the respondent driving through multiple red lights during his flight. We accordingly affirm the respondent's conviction for aggravated fleeing and eluding a peace officer.

¶ 51                                  CONCLUSION

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.